COPY                    UNDER SEAL

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED-SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

FEB – 6 2018

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. SA 18 - 0 3 9 M |
| JOHNNY PAUL TOURINO | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ February 28, 2017 _____ in the county of _____ Orange _____ in the
_____ Central _____ District of _____ California _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 50 U.S.C. § 1705(a), (c) ; and | Conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"); and |
| 31 C.F.R. § 560.204. | Conspiracy to violate the Iranian Transaction Regulations ("ITR") |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
/ S /
*Complainant's signature*

SA Michael J. Engallena - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2.6.2018                    _____

**Jay C. Gandhi**
*Judge's signature*

City and state:          Santa Ana, California          Hon. Jay C. Gandhi, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Michael J. Engallena, being duly sworn, declare and
state as follows:

### I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI"), and have been so employed since July
2011.  I am a law enforcement officer of the United States
within the meaning of Title 18, United States Code, Section
2510(7), who is empowered to conduct investigations of, and make
arrests for, the offenses enumerated in Titles 18 and 21 of the
United States Code.

2.    Beginning after my graduation from the FBI Academy in
July 2011 until July 2017 I was assigned to squads that conduct
investigations into national security matters, first with the
FBI's Los Angeles Division and then with FBI's Orange County
Resident Agency.  Since July 2017, I have been assigned to a
Criminal Enterprise Squad, which conducts investigations into
gang activity, in conjunction with the FBI's Los Angeles
Metropolitan Task Force on Violent Gangs ("LAMTFVG"), a multi-
agency Federal, state, and local gang task force.  I am now
primarily responsible for working investigations that target
violent street gangs involved in the possession with intent to
distribute, and distribution of, controlled substances; firearms
violations; racketeering offenses; as well as the conspiracies

1

associated with these offenses.  Prior to joining the FBI, I was
a Deputy Attorney General for the State of New Jersey.

## II.  PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of a criminal
complaint and arrest warrant for JOHNNY PAUL TOURINO ("TOURINO")
for conspiracy to violate the International Emergency Economic
Powers Act ("IEEPA"), 50 U.S.C. § 1705(a), (c) and the Iranian
Transaction and Sanctions Regulations ("ITSR"), formerly named
the Iranian Transactions Regulations, 31 C.F.R. § 560.204.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to demonstrate only that
there is sufficient probable cause for the requested complaint
and does not set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only and all dates are
approximate.

## III. SUMMARY OF PROBABLE CAUSE

5.    The FBI and the U.S. Department of Commerce's Office
of Export Enforcement ("OEE") have been investigating ongoing
efforts by TOURINO and his wholly owned company, Spectra
Equipment, Inc. ("Spectra"), of Laguna Niguel, California, to

2

purchase in 2015 and 2017 U.S.-origin and non-U.S.-origin, high-capacity commercial computer servers manufactured by U.S. Company #1 ("computer servers")[1] on behalf of uncharged coconspirators #1 and #2, and illegally export the same for the true end use by a financial institution, namely Bank Mellat, in Iran.

6.   The FBI criminal investigation was initiated in February 2017, after U.S. Company #1 reported to the FBI that TOURINO and Spectra were purchasing the computer servers for a purported China-based broker ("uncharged coconspirator #2"). TOURINO falsely told U.S. Company #1 that the broker wanted the computer servers shipped from the United States to the United Arab Emirates ("UAE") and that the broker's company would then re-export the computer servers to an unidentified end-user in Slovenia.

7.   U.S. Company #1 reported to the FBI that its corporate counsel had made repeated demands for specific end-user information from TOURINO and Spectra's counsel ("Spectra's

---

[1] According to U.S. Company #1, the computer servers are advanced, mainframe computer servers used in large-scale commercial operations with a potential market value of at least $1.6 million per unit when new, depending on various factors. The computer servers were dual-use commercial goods, which were items that had both a commercial application and a military or strategic use, controlled for anti-terrorism and national security reasons under the Export Administration Regulations, 15 C.F.R. §§ 730-774 by the Commerce Control List ("CCL") under Export Control Classification Number ("ECCN") 5A002.A.

Attorney").  In response, TOURINO and Spectra's Attorney
represented that U.S. export regulations would be followed and
the servers would not go to Iran or other prohibited
destinations.  Because of U.S. Company #1's concerns regarding
the end-use of the computer servers, the completion of the
transaction and the delivery of the computer servers was
delayed.  In an effort to facilitate the release by U.S. Company
#1 of the computer servers, Spectra's Attorney tried to convince
U.S. Company #1 to trust Spectra in this deal in light of the
fact that Spectra had previously purchased four computer servers
for $2.9 million from U.S. Company #1's Australia subsidiary in
2015 using an Australia-based partner for this same customer,
uncharged coconspirator #2 (the "2015 Australia Deal").  In
support of this effort, Spectra's Attorney forwarded a copy of
recent emails that uncharged coconspirator #2 sent to TOURINO
referring to the purported Slovenia-based end-user.

    8.    The investigation revealed uncharged coconspirator #2
is an individual based in Iran, and that he operated a Hong
Kong-based company ("Broker A") as a "front company", or as a
business used to facilitate the illegal shipments and re-exports
of the computer servers to Iran.  Despite TOURINO's and
TOURINO's Attorney's representations to U.S. Company #1,
TOURINO's emails show the real buyer in both deals was the Iran-
based uncharged coconspirator #1 operating on behalf of the

4

Iran-based financial institution and that the computer servers were destined for Iran.

9. With regard to the subject transaction, U.S. Company #1 ultimately accepted the representations from TOURINO and TOURINO's Attorney that the end-user was in Slovenia and not Iran, and allowed the transaction to proceed. Around February 2017, TOURINO sent U.S. Company #1 three checks totaling $1.125 million (about 50% of the purchase price).

10. In March 2017, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") imposed financial "blocking" orders on two wire payments totaling about $1 million that two entities in the Middle East sent to a Spectra bank account. Uncharged coconspirator #2's emails show he initiated those payments and that TOURINO intended to transfer the funds to U.S. Company #1 for the computer servers. The funds remain blocked, and the transaction was not completed.

11. TOURINO's emails show that the computer servers were destined for Iran, not Hong Kong or Slovenia.

12. The facts set forth herein are based on records produced by U.S. Company #1, including emails dating back to 2015; information obtained from open sources, commercial databases, and other government agencies (OEE and OFAC); and the email content, account information, and header information (also

referred to as email toll records) obtained from various email providers.

## IV.  LEGAL BACKGROUND

13.  The International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Sections 1701-1707, authorizes the President of the United States to impose trade sanctions on a country in response to unusual and extraordinary threats to the national security, foreign policy, and economy of the United States presented by that country.  Beginning in 1995, by Executive Orders and pursuant to the authority in IEEPA, the President of the United States imposed such sanctions on Iran. It is a felony to willfully violate or attempt to violate any order or regulation issued under the authority of IEEPA.

14.  The Iranian Transactions and Sanctions Regulations ("ITSR"), promulgated under the authority of IEEPA, are set forth in Title 31, Code of Federal Regulations, Part 560.  OFAC is responsible for administering these regulations.  Generally, unless a person obtains a license from OFAC to do so, goods, technology, or services may not be exported, re-exported, sold, or supplied, directly or indirectly, from the United States, or by a United States person, wherever located, to Iran.

15.  Specifically, § 560.204 of the regulations provides:

the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any

6

goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a)    Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . .

16.  Additionally, § 560.208 of the regulations provides:

no United States person, wherever located, may approve, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by this part if performed by a United States person or within the United States.

## V.    STATEMENT OF PROBABLE CAUSE

17.  This affidavit addresses two purchases of computer servers by TOURINO and Spectra with the intent to ship the computer servers to Iran.  The first purchase involved a completed transaction of the purchase of four computer servers from U.S. Company #1's Australian subsidiary in 2015.  The second purchase was an attempted purchase of four or five computer servers from U.S. Company #1's New York headquarters.  The second purchase was disrupted when OFAC blocked funds wired to Spectra's bank account for the purchase.

**A.** **Background on TOURINO and Uncharged Coconspirators #1 #2**

1. TOURINO

18. TOURINO identifies himself as Vice President of Spectra in emails with customers. According to its website, Spectra operates as a broker of computer-related electronics and equipment, buying and selling such equipment from large computer manufactures. TOURINO conducts business from Spectra's office, located in Laguna Niguel, California.

2. Uncharged Coconspirator #1

19. According to internet protocol ("IP") login information, uncharged coconspirator #1 is an individual located in Iran. According to his email signature, he is the IT Manager of an Iran-based company. Open-source searches also show uncharged coconspirator #1 is an assistant professor at an Iranian university. Email correspondence shows that uncharged coconspirator #1 appears to have initiated the subject transaction with TOURINO, using uncharged coconspirator #2 as a straw buyer to conceal the fact that Iran was the ultimate destination for the servers.

3. Uncharged Coconspirator #2

20. Uncharged coconspirator #2 owns and/or operates a Hong Kong-based company ("Broker A"). OEE records queries for prior exports of U.S.-origin goods by Spectra revealed Spectra had listed Broker A, with a Hong Kong address, as the ultimate

consignee on seven prior shipments.  Those exports all involved shipments of electronics, including products sold by U.S. Company #1.

21.  Open-source and commercial database queries for Broker A showed "white pages" listings for the company, but a minimal online presence.  For example, Dunn and Bradstreet queries yielded no information concerning its address, executives, or number of employees.  Based on my training and experience, I know that a company's lack of an online presence is one indication the entity may exist in name only and is in fact a front company.

22.  Email account information for an account uncharged coconspirator #2 used to communicate with TOURINO showed uncharged coconspirator #2 was the subscriber.  Subscriber information for the account identified a phone number with a 98-prefix--the country code for Iran.  Recent email toll records for the account indicated its known IP connection logs resolved almost exclusively to Tehran, Iran between April and June 2017. Historical IP connection logs resolved to Iran since at least 2014.

### B.    Initial Investigation

23.  On February 24, 2017, U.S. Company #1 contacted the FBI to report concerns U.S. Company #1 had about a pending sale to TOURINO and Spectra.  The representative stated that U.S.

Company #1 had performed its due diligence and several areas of concern were noted; however, in U.S. Company #1's view, those concerns did not constitute reason to terminate the sale.

24.  The representative detailed the following concerns to the FBI: (1) that the servers were produced in 2007, and therefore constituted "old" and unused technology; (2) TOURINO, on behalf of Spectra, had refused to name an end-user for the sale even after U.S. Company #1 offered to sign a nondisclosure agreement; and (3) while TOURINO had stated the servers were for an end-user in Slovenia, TOURINO requested the servers be shipped to Dubai, UAE, which caused U.S. Company #1 to have concerns about the legitimacy of this transaction, given that this was not the most direct or cost effective shipping route.

### C.  The 2015 Australia Deal

25.  In mid-2015, Spectra completed the purchase of four computer servers with U.S. Company #1's Australia subsidiary for approximately $3.2 million AUD ($2.9 million USD), in conjunction with Spectra's local partner in Australia. According to TOURINO's Attorney, this purchase was for uncharged coconspirator #2.  However, TOURINO's emails indicate uncharged coconspirator #1 was the real buyer and that uncharged coconspirator #2 was merely a straw buyer.

26.  The 2015 Australia deal arose from email discussions TOURINO had with U.S. Company #1's Australian subsidiary,

10

starting around 2014.  In an email dated February 12, 2014,
defendant TOURINO requested a price quotation from U.S. Company
#1 for computer servers.  In response to a request for end-user
information, TOURINO falsely stated that his customer was a
systems integrator in Dubai, UAE, and the end-user of the
computer servers was located in Kuwait.  In an email on February
19, 2014, U.S. Company #1 quoted TOURINO prices for computer
servers at approximately $2.5 million AUD ($1.2 million USD)
each.[2]  U.S. Company #1 also listed various terms and conditions,
including that the purchaser provide the name and address of the
end-user organization.

   27.  On November 17, 2014 and March 18, 2015, U.S. Company
#1 emailed TOURINO to clarify that export regulations required
disclosure of end-user and end-destination information.

   28.  Emails exchanged between TOURINO and U.S. Company #1
in April and May 2015 showed that Spectra would receive payment
from its customer and then pay its Australia-based partner,
which would pay U.S. Company #1.  Spectra official C.T. who
resided in California, was copied on some of those emails, which
discussed payment information required by U.S. Company #1.  On
June 23, 2015, U.S. Company #1 sent TOURINO a purchase order

---

[2] While these amounts were listed on the purchase order,
they do not seem to correspond to the exchange rate at the time.

stating U.S. Company #1 would sell four computer servers for $3,212,000 AUD (approximately $2,900,000 USD).

29. On July 30, 2015, TOURINO sent an email to uncharged coconspirator #2, stating "Your customer '[first name of uncharged coconspirator #1]' called us today from Germany to check status."

30. Bank records obtained for a Spectra bank account show that between June 15 and August 5, 2015, Broker A (uncharged coconspirator #2's company) sent a series of nine wires totaling $3.5 million USD to Spectra. On June 29, 2015, TOURINO told uncharged coconspirator #2 that his $900,000 was safe in Spectra's bank account. During that same time, Spectra sent at least three wires totaling $2.19 million USD to Spectra's Australian partner. The four computer servers were shipped on or about August 10, 2015 to Broker A in Hong Kong. Spectra was listed as the shipper on the shipping documents.

31. On August 31, 2015, TOURINO received an email from uncharged coconspirator #1. In that email, uncharged coconspirator #1 expressed his thanks for all of TOURINO's "professional endeavours" during the project's "procurement, testing, delivery, and shipment." Uncharged coconspirator #1 stated the Iranian Financial Institution had another forthcoming tender offer and that he hoped to work with TOURINO again.

Uncharged coconspirator #1 signed the email as IT Manager for his company.

32. On September 8, 2015, TOURINO responded favorably to an offer by uncharged coconspirator #1 for an exclusive agreement on future business.

**D.    The 2017 Deal**

33. In email dated September 9, 2015, TOURINO emailed a Remarketing Manager at U.S. Company #1 ("Manager") and asked for a price quotation for computer servers. TOURINO and the Manager's email discussions continued throughout pendency of the subject transaction, with the Manager providing various price quotes and server configurations upon TOURINO's request.

34. On September 12, 2015, uncharged coconspirator #1 informed TOURINO that the Iranian financial institution had officially announced the tender offer for five computer servers.

35. In an email dated September 21, 2015, uncharged coconspirator #1 told TOURINO that he would buy the computer servers from TOURINO because "we had a successful deal." Uncharged coconspirator #1 also stated that TOURINO knew of his "capabilities and stability in Iran's market."

36. In an email dated September 23, 2015, TOURINO told uncharged coconspirator #1 that U.S. Company #1 was interested in the deal and that it could allocate the computer servers if he and his customer were "willing." TOURINO also asked

13

uncharged coconspirator #1 if uncharged coconspirator #1 "will again be using" uncharged coconspirator #2 to "accomplish" this deal.  Uncharged coconspirator #1 responded that uncharged coconspirator #2 would be his "agent" in the deal.

37.  In an email dated January 14, 2016 that included references to "Tehran" and "Iran," uncharged coconspirator #1 told TOURINO that TOURINO's competitor had won the deal. TOURINO forwarded this email to U.S. Company #1 on January 15, 2016, but removed the references to "Tehran" and "Iran."

38.  In an email dated January 18, 2016, TOURINO congratulated his competitor for winning the deal and offered to provide computer servers if the competitor was unable to provide all the required equipment to the Iranian financial institution. On January 29, 2016, TOURINO's competitor responded, "Iran is sanctioned by the US and I do not want to be involved (directly or indirectly) with any deal related to Iran or even hear about such opportunities."

39.  In an email dated February 24, 2016, uncharged coconspirator #1 told TOURINO that the Iranian financial institution had not made its decision regarding who to purchase the computer servers from and that TOURINO still had an opportunity to obtain the deal.  Uncharged coconspirator #1 also stated that if TOURINO did not accept payment from Iran, uncharged coconspirator #2 could make the payment.

40.  On February 25, 2016, TOURINO responded to uncharged coconspirator #1 to state that with regard to the payment question:

> I don't know the status of this as we're not politically involved, but as you seem to have sound relations with [uncharged coconspirator #2] and . . . we're open to work with either, at your discretion.

41.  In an email dated March 2, 2016, uncharged coconspirator #1 told TOURINO that he was still waiting for a purchase order from the Iranian financial institution and that "Iranian new year" was approaching.

42.  On September 1, 2016, The Manager emailed TOURINO about a worldwide End User Certification ("EUC") requirement. U.S. Company #1 advised all offers were contingent on approval by the company's Export Regulation Office; and that U.S. Company #1 would require an EUC from the "ultimate intended end user of the hardware."  The EUC had to appear on the ultimate end-user's letterhead signed by an officer of the end-user's company, stating: (a) the equipment by type/model and serial number; (b) where it would be installed; and (c) by whom it would be used.

43.  In an email dated November 11, 2016, TOURINO asked uncharged coconspirator #1 whether uncharged coconspirator #2 was his "preferred intermediary" with respect to the computer server deal.  In a reply, uncharged coconspirator #1 confirmed that uncharged coconspirator #2 would be in contact "[a]s for

the previous deal[,]" appearing to refer to the 2015 Australian deal.

44.    On November 30, 2016, the Manager emailed TOURINO that because the subject transaction seemed to be moving along, he wanted to apprise him that final approval by management was contingent on the following provision in the Order Confirmation: a buyer acknowledgment that the equipment was subject to U.S. export control and economic sanctions laws and a warranty that the buyer would not export the items, directly or indirectly, to any prohibited end-user or destination including Iran, among other locations.

45.    On December 1, 2016, a U.S. Company #1 contract analyst sent TOURINO a master agreement, copying the Manager. TOURINO responded to the Manager on December 7, 2015, "Got it ... read it ... more '[U.S. Company #1] manufactured BS,' but whatever."

46.    In an email dated December 16, 2016, TOURINO expressed frustration to uncharged coconspirator #1 with respect to the delay of the deal, noting "they" do not always purchase the equipment they identify in their tender offers. Uncharged coconspirator #1 responded, "[y]ou are right, this is the true story about Iran's market."

47.    On January 20, 2017, in response to an email from TOURINO regarding the delay, uncharged coconspirator #1 replied

"[i]n Iran, Thursdays and Fridays are weekends.  It is not bad for you to know more about your partners [sic] culture."

48.  On February 5, 2017, TOURINO sent U.S. Company #1 a purchase order for four computer servers for a total value of $2,125,000.

49.  From February 7, 2017 through February 13, 2017, uncharged coconspirator #2 caused to be sent to TOURINO and SPECTRA three wire transfers totaling approximately $1,230,000 through two front companies located in the United Arab Emirates as partial payment for the purchase of the computer servers.

50.  Starting in February 2017, U.S. Company #1's corporate counsel began raising export concerns about the subject transaction.  On February 6, 2017, in response to questions from U.S. Company #1 about the identity of the end-user and the machines' final destination, TOURINO sent U.S. Company #1 an email stating Spectra was "not dealing with, nor do we know the end-user."  It was his understanding, though, that the end-user was a bank in Africa, stating:

> We do know it's a Bank and to whom we've sold/provided these Consultants some $2M+ USD of new Verifone POS/Point of Sale equipment.  We only learned they were in located in Africa because frankly, there were some "African" language issues to settle with Verifone Techs to enable their Banking transactions.
> . . .
> As expected, the Consultant Broker was suspect and sufficiently vague, but assured us they were going to the same (African) location as the VeriFone equipment and emphasized they are NOT going to Iran.

17

51.   On February 18, 2017, TOURINO sent uncharged
coconspirator #2 an email that included earlier exchanges
between TOURINO and TOURINO's Attorney and U.S. Company #1's
counsel concerning the end-user/destination issues, as well as
his own commentary.   With regard to the end-use destination,
TOURINO wrote: "note: I mentioned Africa as a possibility, from
a previous . . . deal."   Thus, despite knowing of the Iranian
financial institution's involvement from the start, TOURINO
instead deliberately misrepresented "Africa" as the destination
of the computer servers to U.S. Company #1 as a means to deceive
U.S. Company #1 as to the true end user of the computer servers.

52.   On February 19, 2017, uncharged coconspirator #2
replied to TOURINO's email by proposing a Slovenia-based company
that could be listed as the end-user.   He wrote in part:

> for the sake of solving this problem, which as I see,
> is a formal requirement for export license, I suggest
> you, if it will help, to introduce one of our friend's
> company in Slovenia . . . . Slovenia is among the
> Organization for Economic Cooperation and Development
> . . . 35 countries."

He added, though, that Slovenia was a "poor country and they
cannot purchase all the four machines immediately."   Rather,
"They can buy it in a timely schedule process which may take one
year or more," so "we purchase the machines and collect them in
our store in Dubai."   He explained: "It is a sort of investment
which we are doing because we thought that now [U.S. Company #1]

price for this deal is providing an opportunity for investment."
On February 20, TOURINO forwarded this email to TOURINO's
Attorney, and TOURINO's Attorney forwarded it to U.S. Company #1
on February 21.

53. The email TOURINO's Attorney sent to U.S. Company #1
was edited. In the email, "friend's" was replaced with
"customers." The references to Slovenia being a "poor country,"
the customer's (or country's) inability to purchase all four
machines at once, and uncharged coconspirator #2's view of the
deal as an "investment opportunity" for his own company were all
blacked out by hand.[3]

54. On February 27, 2017, U.S. Company #1 sent TOURINO a
confirmation that the deal was approved.

55. In an email dated February 28, 2017, TOURINO advised
U.S. Company #1 that Spectra sent checks via overnight mail for
the computer servers. The checks were issued from a Spectra
bank account maintained at HomeStreet Bank in Irvine,
California. On March 1, 2017 U.S. Company #1 replied that it
would release the "first three machines." The following day the
employee emailed TOURINO notices of release for shipment of two
of the four orders.

---

[3] I believe these changes were made to minimize U.S. Company
#1's export concerns.

56.   In early March 2017, two foreign wire payments totaling approximately $1,000,000 to Spectra originating from the United Arab Emirates were blocked by OFAC.  According to two OFAC blocking memoranda sent to Spectra's bank, the instructions were issued under OFAC's administrative authority pursuant to Executive Order 13599, IEEPA, and the ITSR.

57.   On March 15, 2017, TOURINO emailed U.S. Company #1 copies of the blocking memos.  U.S. Company #1 has since cancelled the transaction as a result of these blocking memos.

### E.   TOURINO Deleted Emails Exchanged with Uncharged Coconspirator #1

58.   Preservation letters were issued to TOURINO's email internet service provider on March 2, 2017 and April 15, 2017. Each time the ISP received a preservation letter, it took a snapshot of the account.  The March 2, 2017 snapshot had approximately 200 emails TOURINO exchanged with uncharged coconspirator #1.  The April 15, 2017 snapshot had only one communication remaining no communications with uncharged coconspirator #1.  Comparing the snapshots from before and after the blocking order show that approximately 200 emails were deleted, all exchanged with uncharged coconspirator #1, sometime between March 2, 2017 and April 15, 2017.

### F.   OFAC Licensing Inquiry

59.   In 2017, the FBI submitted a requests to OFAC to determine whether any of the following individuals or entities

had applied for an OFAC license for any type or form of a
transaction, including the export of computer servers to Iran:

  a. Johnny P. Tourino;

  b. Spectra Equipment Inc.;

  c. Uncharged Coconspirator #1;

  d. Uncharged Coconspirator #2;

  e. Broker A;

  f. C.T.; and

  g. The Iranian-based financial institution.

In its responses, OFAC advised that its queries showed Spectra
applied for a license to release $479,929.58 originating from
the UAE (the first blocked payment) on March 14, 2017, which
OFAC denied April 3, 2017. OFAC further advised that Spectra
had applied for a license to release $519,929.58 (the second
blocked payment) on June 13, 2017, which OFAC denied on
September 19, 2017. OFAC's search disclosed no other responsive
records of license applications submitted by or on behalf of, or
of OFAC licenses issued to, any party named above. However,
OFAC's search disclosed that property and interests in property
of the Iranian financial institution were blocked pursuant to
Executive Order 13599.

## VI.   <u>CONCLUSION</u>

60.   Based on the information described above, there is probable cause to believe that TOURINO has committed a violation of 50 U.S.C. § 1705(a), (c) and 31 C.F.R. § 560.204.


_____ / S/ _____

Michael J. Engallena
Special Agent


Subscribed to and sworn before
me this _0_ day of February 2018.

## Jay C. Gandhi

_____

UNITED STATES MAGISTRATE JUDGE